```
IN THE UNITED STATES DISTRICT COURT FOR THE
             EASTERN DISTRICT OF OKLAHOMA
```

```
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
v.                               )  Case No. CR-12-033-JHP
                                 )
CLAUDIA MARIE MOORE and          )
MARK ALDEN MONGOLD,              )
                                 )
          Defendants.            )
```

## FINDINGS AND RECOMMENDATION

On May 14, 2012, this Court conducted a hearing, upon referral by the presiding District Judge, with regard to the Motions to Suppress filed by both Defendants on April 30, 2012 (Docket Entry Nos. 29 and 30). The hearing was attended by Dean Burris, Assistant United States Attorney on behalf of the Government, Robert Ridenour, appointed counsel for Defendant Mark Alden Mongold, and Bret Smith, appointed counsel for Defendant Claudia Marie Moore as well as both Defendants personally. In addition to the evidence taken at the hearing and the information developed in the briefing filed by the parties, this Court took judicial notice of the transcript of the detention hearing conducted on April 18, 2012 in this case upon motion of the Government and without objection from Defendants.

Ashley Stephens, a Special Agent for the ATF, testified that he had sometime prior to the events of March 6, 2012 received three telephone calls from neighbors of a residence located in the 2000 block of Horseshoe Bend in Parkhill, Oklahoma in Cherokee County,

Oklahoma. The neighbors complained of traffic at the residence and asked law enforcement to intervene. Special Agent Stephens was familiar with the residence as a result of an investigation in 2010. In this earlier incident, law enforcement was investigating a multi-pound methamphetamine conspiracy. Defendant Moore was present at the residence when law enforcement entered the residence and admitted at that time to being involved in the sale of a large amount of methamphetamine within the organization being investigated. Additionally, agents found a fugitive present at the residence and took him into custody.

With this knowledge, Special Agent Stephens observed the residence several days prior to March 6, 2012 while conducted another investigation in the area and noted approximately four vehicles at the residence. Thereafter, Special Agent Stephens conducted specific surveillance of the residence about a week prior to March 6, 2012. At that time, he observed three vehicles come and leave the residence every 5-6 minutes in a period of approximately 40 minutes. After this surveillance, Special Agent Stephens did not believe he had enough evidence of probable cause to obtain a warrant. He did, however, know Defendant Moore lived at the residence. Based upon his prior knowledge of the conduct of drug activity on the premises, he determined to make contact with the residents.

On March 6, 2012, Special Agent Stephens, ATF Special Agent Kurt Collins, Cherokee County Investigator Casey Baker, and

2

Tahlequah Police Department Investigator Eldon Graves approached the residence in an attempt to talk with the residents. The officers knocked on the door, whereupon they heard "scurrying and shuffling" within the residence, which caused the officers concern. In his experience, Special Agent Stephens testified such activity occurs when a suspect is attempting to dispose of evidence.

After law enforcement knocked on the door, a male occupant asked who it was and Special Agent Stephens responded, "the police." The door of the residence was opened by Defendant Mongold. Special Agent Stephens testified that he could smell marijuana immediately upon the door being opened – both burnt and fresh – as well as the smell of cigarette smoke. He also observed what he assessed in his training and experience to be prison tattoos on Defendant Mongold's arms which raised his concern Defendant Mongold was a convicted felon.

Special Agent Stephens asked Defendant Mongold if Defendant Moore was in the residence and that he wanted to talk to her. Defendant Mongold responded that she was in the back room and he turned to go get her. For the stated reasons of officer safety, the presence of a known convicted felon, and the presence of the smell of marijuana, the officers followed Defendant Mongold into the residence. Special Agent Stephens noted ash trays all over the house.

Officers observed Defendant Moore coming out of the bathroom of the master bedroom of the residence. Special Agent Stephens

3

noticed a sleeve that had 12-gauge shotgun shells in it sitting on a dresser in the bedroom. Officers asked Defendant Moore to come out of the residence on the front porch so they could speak with her. Officers also directed Defendant Mongold and two of Defendant Moore's adult children, Andrea Winsett and Robert Mayes to go to the front porch as well.

Once on the front porch, Special Agent Stephens advised all four residents of their Miranda rights. He testified all four individuals stated they understood and agreed to speak with law enforcement. Additionally, Special Agent Stephens requested consent to search from all four residents and explained the consent to search form to them. He told the residents that he believed each of them had an expectation of privacy because they had all been staying at the residence. All four individuals signed a consent to search form. The residents were not placed under arrest at this time. The residents were not told a search would be conducted with or without their consent and were not patted down. Officers did not draw their firearms at any time during the encounter.

Upon searching the residence, officers discovered a 12-gauge shotgun that had a sawed off barrel but was still of legal length. The shotgun was found in the closet of the bedroom occupied by Ms. Winsett. Officers also found a loaded .357 revolver inside of a child's backpack in the same closet. Additionally, officers uncovered ammunition scattered throughout the residence. Officers

also discovered various drug paraphernalia as well as marijuana and methamphetamine.

Special Agent Stephens was aware Defendant Moore was a convicted felon at the time of the search. Upon questioning, Defendant Moore indicated the revolver had been traded for methamphetamine and the shotgun belonged to Defendant Mongold. Defendant Moore stated she had asked her daughter to hide the firearms in her bedroom because of her fear of Defendant Mongold. Ms. Winsett corroborated the same information and had lead officers to the firearm in the backpack.

Defendant Mongold told investigators that he had been at the residence for about a month and a half and had seen the firearms on numerous occasions but had not handled them. Officers also found several photographs on Defendant Moore's cell phone of firearms.

Without question, Defendant Mongold testified to a markedly different set of events on March 6, 2012. Upon answering the door, he states he asked officers if they had a warrant. When told they did not, he contends he told officers they could not enter the residence while he went back to get Defendant Moore from the bedroom but that Special Agent Stephens put his foot in the door to prevent its closing. Defendant Mongold states he instructed Ms. Winsett not to let the officers in the residence. While he went to retrieve Defendant Moore, Defendant Mongold testified officers "bulldogged" Ms. Winsett when he was out of their site and entered the residence. Ms. Winsett did not testify to these events during

the hearing. Defendant Mongold also testified officers repeatedly drew and pointed their firearms at both he and the other residents, although he could not recall any specifics regarding the identity of the particular officers drawing weapons other than they were of average build. He also stated that Mr. Mayes was handcuffed in his bedroom by officers and told to go to the living room. Defendant Moore testified he was also handcuffed prior to being taken to the front porch of the residence. Mr. Mayes did not testify during the hearing as to these events. Defendant Mongold stated he did not believe he was free to leave and that he felt he did not have a choice in providing his consent to search the residence.

This Court discounts the veracity of Defendant Mongold's testimony. No corroboration of the events affecting others in the residence as provided by Defendant Mongold was offered at the hearing. Moreover, Defendant Mongold's prior experience in the criminal justice system and motivation for shading the truth as to the events provides little support for this contentions. This Court specifically finds Special Agent Stephens' chronicle of events to be the more credible. United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)("Judging the credibility of the witnesses, determining the weight to be given to evidence, and drawing reasonable inferences and conclusions from the evidence are within the province of the district court.")

Clearly, the jurisprudence indicates that warrantless searches and seizures pertaining to the home are "presumptively

unreasonable." Kentucky v. King, 131 S.Ct. 1849, 1856 (2011)(citations omitted). Exigencies have been recognized to this general rule. One such exception is to prevent "the imminent destruction of evidence" when officers have the reasonable suspicion that the destruction might occur. Id. at 1856-57 (citations omitted). The fact the belief that evidence will be destroyed was developed as a result of law enforcement engaging in a "knock and talk" encounter does not invalidate the exception to the warrantless search. Id. at 1861-62 (citations omitted).

Certainly, in this case, law enforcement had a reasonable suspicion of criminal activity at the time of the "knock and talk" encounter. Based upon the heightened traffic at the residence, the known prior criminal activity at the residence, the presence of Defendant Moore at the residence - a known felon who had previously engaged in a drug selling enterprise, officers were justified in inquiring at the residence through the "knock and talk" procedure. Upon hearing the activity within the residence upon announcing their presence and the smell of illegal drugs once the door was opened and the presence of known or suspected felons on the premises, officers were justified in entering the residence to secure evidence and for their own safety. Officers did not seize any observed contraband until signed consents were obtained from the residents.

Further, Defendants' protestations notwithstanding, nothing in the record indicates the consents were less than voluntary. The

government bears the burden of proving, by a preponderance of the evidence, that the individual voluntarily consented — "a burden that is not satisfied by showing a mere submission to a claim of lawful authority." Florida v. Royer, 460 U.S. 491, 497 (1983). The government must demonstrate that consent was given without duress or coercion, express or implied. United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992). The question of whether an individual has voluntarily consented to a search is a question of fact that the district court must evaluate under the totality of the circumstances. United States v. Sawyer, 441 F.3d 890, 895 (10th Cir. 2006) ("[T]he federal test for determining the validity of consent to search requires a factual determination based upon the totality of the circumstances of whether the consent was the product of an 'essentially free and unconstrained choice by [the] maker' or whether it was the product of 'duress or coercion, express or implied.'"). Factors to consider within the totality of circumstances include:

- the threatening presence of several officers;
- the display or brandishing of weapons;
- some physical touching by an officer;
- use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory;
- prolonged retention of personal effects such as identification, plane or bus tickets;
- request to accompany officer to the station;

- interaction in a nonpublic place;

- absence of other members of the public;

- the administration of *Miranda* warnings;

- use of physical violence;

- oral threats;

- promises, inducements, deception, trickery;

- the physical and mental condition and capacity of the defendant;

- whether the police informed defendant of the right to refuse consent.

United States v. Guerrero, 472 F.3d 784 at 790 (10th Cir. 2007); Sawyer, 441 F.3d at 895; United States v. Hernandez, 93 F.3d 1493, 1500 (10th Cir. 1996).

In this case, while four officers were present, the discussion of consent occurred in an open front porch with no threat of physical violence. Indeed, the evidence indicates Defendant Mongold made some inquiry about the necessity for him to provide his consent to search since he had only been on the premises for a month and a half but ultimately signed the consent form. By all accounts, Special Agent Stephens took pains to describe the nature and meaning of the consent to search form to the residents prior to them executing the forms. Accordingly, this Court finds no basis to conclude the signing of the consent forms was a voluntary, informed and uncoerced act.

IT IS THEREFORE THE RECOMMENDATION OF THIS COURT that the Motions to Suppress filed by both Defendants on April 30, 2012

(Docket Entry Nos. 29 and 30) be **DENIED**.

The parties are herewith given fourteen (14) days from the date of the service of these Findings and Recommendation to file with the Clerk of the court any objections, with supporting brief. Failure to object to the Findings and Recommendation within fourteen (14) days will preclude appellate review of the judgment of the District Court based on such findings.

IT IS SO ORDERED this 17th day of May, 2012.

Kimberly E. West
United States Magistrate Judge
Eastern District of Oklahoma